George and Larry CHILD et al., Plaintiffs,

v.

Abraham BEAME, Individually and as Mayor of the City of New York et al., Defendants.

No. 75 Civil 336.

United States District Court, S. D. New York.

Feb. 20, 1976.

Marcia Robinson Lowry, Peter Bienstock, Children's Rights Project New York Civil Liberties Union, New York City, for plaintiffs.

W. Bernard Richland, Corp. Counsel, New York City, for defendants Beame, Dumpson, Sugarman, Parry, Blum and Beine; James G. Greilsheimer, Litigating Asst. Corp. Counsel, Carmela Ackman, Asst. Corp. Counsel, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen., New York City, for defendants Shapiro and Lavine; Stanley L. Kantor, Harold Tompkins, Asst. Attys. Gen., New York City, of counsel.

Davis, Polk & Wardwell, New York City, for or of counsel to defendants Francine, Barlow, Matthews, O'Neill, White, McCormack, Foster, Gaynor, Breen, Chillion, Howard, James, Chrysostom, Fogarty, Rutnik, McMahon, Trager, Meaney, Olivia, Harris, John and Santagata; Richard E. Nolan, Alfred E. Schretter, Thomas J. Aquilino, Jr., New York City of counsel.

Kenneth Harfenist, New York City, for defendant Paul.

Burns, Kennedy, Schilling & O'Shea, New York City, for defendant Ritter; Edmund J. Burns, New York City, of counsel.

Fox, Glynn & Melamed, New York City, for defendants Burbank, Stone and Wiener; John R. Horan, David J. Melamed, Joseph D. Becker, New York City, of counsel.

Bodell & Magovern, P. C., New York City, for defendants Hawthorne, DeMartino, Morrison, Trobe, Schneider, Kelly, Sheridan, Bennington, Paul and Quinn; Gerald E. Bodell, Leonard F. Manning, David H. Berman, New York City, of counsel.

Bernstein, Seawell, Kaplan & Block, & Weiner, New York City, for defendant Zucker; Frederick H. Block, New York City, of counsel.

Migdal, Tenney, Glass & Pollack, New York City, for defendant Bullard; Lester Migdal, New York City, of counsel.

Humes, Andrews, Botzow & Wagner, New York City, for defendants Gaskill and Winterrowd.

Milburn & Ackerman, New York City, for defendant Siewers.

Hale & Russell, New York City, for defendant Patrick.

Patrick M. Campbell, New City, N. Y., for defendant Murphy.

Satterlee & Stephens, New York City, for defendant Gutheil.

Bleakley, Platt, Schmidt & Fritz, New York City, for defendants Robinson and Daniels.

OPINION

EDWARD WEINFELD, District Judge.

This is a class action for declaratory and injunctive relief and damages pursuant to 42 U.S.C., sections 1983, 1985 and 1986, and 28 U.S.C., sections 2201 and 2202, to redress rights guaranteed by the First, Eighth, Ninth and Fourteenth Amendments and Title IV of the Social Security Act. Jurisdiction is grounded upon 28 U.S.C., sections 1331(a), 1343(3) and (4).

The action was commenced by five plaintiffs, children between the ages of eleven and fourteen, all of whom are described by the surname "Child" (admittedly fictitious), on their own behalf and on behalf of all others similarly situated, through their "next friend," Monroe Freedman. The class includes New York City children whose relationship with their natural parents has been or would be legally terminated if appropriate legal action were taken, and who, under New York State's Social Services Law, have been placed, and now are, in the care and custody of New York City authorized child-care agencies. The defendants, in addition to state and local officials who are charged under state law with various duties with respect to child-care agencies, include the administrators or executive directors of virtually every Catholic, Protestant, Jewish and nonsectarian child-care facility in the Greater New York Metropolitan Area.

However phrased in the voluminous complaint, plaintiffs' various claims are based upon a central charge that the defendants, jointly and severally, engaged in a custom, pattern and practice and pursued a deliberate policy of keeping plaintiffs and members of their class in temporary foster care settings for their entire childhoods without vigorously seeking to obtain permanent adoptive parents for them, although such adoptive homes could be found, thereby depriving them of a fundamental right to a permanent stable home in violation of one or more of their federally protected constitutional rights. The alleged policy of defendants is attributed to, among other reasons, a purpose on the part of the defendants to receive financial benefits from the state and federal governments while the children remain in their custody. Plaintiffs allege that members of their class comprise over 5,000 and that they also represent a sub-class within that group of non-white children who "are more likely" to be denied their constitutional right to a permanent stable home by defendants than are white children.

The relief sought is (1) a declaratory judgment and injunction against the defendants' alleged practice of keeping plaintiffs and members of their class in a variety of temporary foster care settings for their entire childhoods without vigorously seeking to obtain for them permanent adoptive homes; (2) compensatory and punitive damages against the state, the city and the agency administrators for willfully violating plaintiffs' constitutional and federal statutory rights.

The nature of the charges, which include malicious motives of selfish financial gain, has stirred deep resentment, particularly on the part of the administrator defendants, who feel that their dedicated efforts through the years in attempting to provide adoptive homes for abandoned, neglected or abused children have been unfairly distorted in an effort to pose an abstract constitutional claim and not in the best interests of all the children or their welfare.

Thus, several defendants, entirely apart from any challenge to the complaint itself, move to dismiss on various lack of standing grounds. They initially charge that Monroe Freedman, described as the "next friend" of plaintiff children, a lawyer and dean of Hofstra Law School, in fact is not their "next friend" and lacks standing to sue under Rule 17(c) of the Federal Rules of Civil Procedure. These defendants further charge that Ms. Marcia Robinson Lowry and Mr. Peter Bienstock, attorneys associated with the New York Civil Liberties Union, who represent the plaintiff Freedman, by reason of their conduct attendant upon the commencement of this suit, cannot certify that there is good ground to support the complaint; accordingly they also move to dismiss under Rule 11 of the Federal Rules of Civil Procedure. It is desirable first to consider these motions, since if either is upheld there is no occasion to reach the merits of the issues posed by the complaint, dismissal of which is sought by most of the defendants.

## I

## THE MOTIONS TO DISMISS UNDER RULES 11 AND 17 OF THE FEDERAL RULES OF CIVIL PROCEDURE.

The challenge to the "next friend" and his attorneys centers about events which occurred in or about November and December, 1974 at Abbott House, a childcare agency defendant herein, where the five child plaintiffs were then in institutional care. The essence of the charge is that Charles Awalt, the then executive director of Abbott House, permitted Ms. Lowry and Mr. Bienstock to inspect the confidential files of all children then in institutional care at Abbott House; that thereafter Mr. Awalt arranged for the lawyers to interview the five named plaintiffs; and that the interviews were conducted without the presence or knowledge of the Abbott House staff, with the possible exception of Mr. Awalt, who it is alleged had no immediate case responsibility for any of the five children. It is further alleged upon information and belief that Monroe Freedman has never met any of the five children, has never visited Abbott House nor communicated with any one on its staff. The clear implication is that Mr. Awalt not only exceeded his authority in making Abbott House files available, but violated its right to preserve the confidentiality of its records of the children under its care, as well as the children's right of privacy as to information contained therein.

In opposition, the plaintiffs submit the affidavit of Mr. Awalt. His version of events is that he was concerned with children who grew up in foster care without being referred for adoption and without adoptive homes being sought for them; that this led him to enlist Ms. Lowry's interest; that he permitted her to examine the files of Abbott House so that she could talk to children who had been in foster care for some time, who had no contact with their natural parents and who expressed their willingness to talk to a lawyer; that the files dis-

closed the names of the five child plaintiffs who, upon subsequent interviews with Ms. Lowry and Mr. Freedman, consented that they proceed with the class action suit. Mr. Awalt, while acknowledging that the child-care agency records are governed by a rule of confidentiality, states he authorized Ms. Lowry and Mr. Bienstock to look at the records of children at Abbott House and did so with the understanding that their contents would not be revealed and would be used only with the consent of the children involved; further, that, as executive director of Abbott House, he was responsible for the well being of those children and he believed his action was in their best interests.

Mr. Freedman has submitted an affidavit in which he disputes the movants' "upon information and belief" allegation that he has never met the children. He swears that he did meet and speak with the child plaintiffs in December 1974 and early January 1975; that they described their experiences in foster care and expressed their desires to have parents of their own with whom they could live; that he explained to them the nature of the action to establish the right of adoption for them and other children similarly situated; and that all indicated their desire to participate in a lawsuit with him as their spokesman and Ms. Lowry as their lawyer.

We first consider the defendants' charge that the children were made plaintiffs by conduct which violated their rights and which cannot confer standing upon them to maintain this action. The contention here is that the examination of the files by the attorneys infringed on the privacy of the five child plaintiffs and on the privacy of the other children whose files also were examined, and further was a violation of the policies of Abbott House concerning the confidentiality of its records. However, the affidavits submitted make it clear that Ms. Lowry and Mr. Bienstock were invited to examine the records by Mr. Awalt; that

their purpose in so doing, as well as the prospect of litigation was known to Mr. Awalt; and that Fred Lesny, the then Director of Social Services at Abbott House and the custodian of the records who permitted the inspection, also knew that the attorneys were associated with the Civil Liberties Union and was not unaware of their purpose in making the examination. Mr. Lesny concedes it was he who authorized Mr. Awalt to make the records available to the attorneys. If there was a breach of the internal rules of Abbott House with respect to the confidentiality of files, this is a matter that relates to the two officials there—that is, Mr. Lesny and Mr. Awalt—which cannot be attributed to either of the attorneys, whose actions were open and above board. Under the circumstances, the claim that the children were made plaintiffs by conduct which violated their rights and thereby forecloses their standing to maintain this action must fail.

Next, the movants challenge on a different ground both Mr. Freedman's standing, as well as that of the children, to bring this action. Here they urge that the use of the children's names as plaintiffs was contrived; that in reality, based upon the facts referred to above, Freedman is not their "next friend"; that the real plaintiffs are Freedman and the Civil Liberties Union; that Freedman's role as "next friend" and the use of the children as plaintiffs are solely to confer jurisdiction upon this court to obtain an adjudication of questions of federal constitutional law desired by persons who otherwise would have no standing to raise these issues. The argument proceeds that neither Freedman nor the children have standing to sue since they are not plaintiffs in the sense that the complaint contains no specific allegations of conduct of defendants in relation to them—rather the complaint contains only general allegations of wrongs universally suffered by children in foster care. Accordingly, it is argued that the complaint should be dismissed.

▮ Rule 17[1] of the Federal Rules of Civil Procedure provides that an infant may sue by his "next friend" or by a guardian ad litem. No guardian ad litem has been appointed for the infant plaintiffs, nor has an application been made for such appointment; and it is alleged that their natural parents have abandoned all interest in them. The Rule does not describe who qualifies as "next friend." The term is broad enough to include any one who has an interest in the welfare of an infant who may have a grievance or a cause of action. Here Freedman did not know the children until his aid was enlisted by the Civil Liberties Union. While Freedman may well be interested in establishing a constitutional base for the children's claims, this is not to say he is less interested in their welfare. While one may question just how much the children, all between the ages of eleven and fourteen years, understood when Mr. Freedman explained to them the purpose of the class action to establish a constitutional right to adoption, it can hardly be doubted that under the circumstances of the interviews they expressed desires for a permanent home. In any event, nothing has been presented on this record to impugn his good faith or that of his attorneys in their discussions with the children or to indicate they did not authorize him as "next friend" and Ms. Lowry as their attorney[2] to proceed with this action to vindicate their claim. The right of access to courts by those who feel they are aggrieved should not be curtailed; and this is particularly so in the instance of children who, rightly or wrongly, attribute such grievances to their very custodians. Those who propose to speak for the plaintiffs have manifested an interest in their welfare and should, under the circumstances here presented, be allowed to proceed.

▮ As to the further claim that there is lack of standing to sue because the complaint contains no specific allegation of conduct toward each of the five child plaintiffs by its child-care agency, this contention ignores the specific allegations of the complaint. These charge that defendants followed a custom, pattern and practice of keeping plaintiffs and members of their class in temporary foster care settings for their entire childhoods without vigorously seeking to obtain permanent adoptive homes for them. While it is true these are general allegations, they apply to plaintiffs as well as to all children under foster care. Thus, accepting, as we must, that the allegations are true, the custom, pattern and practice has a direct impact upon the child plaintiffs. In this circumstance their standing to sue is not open to question.[3]

▮ The movants next seek to strike the complaint for a violation of Rule 11 of the Federal Rules of Civil Procedure.[4] Based on this rule, the defendants charge that Ms. Lowry, who signed the complaint together with her co-counsel, has alleged as to the defendants wilful and malicious motivations without any

1. Rule 17(c) provides:
 "Whenever an infant . . . has a representative, such as a general guardian . . or other like fiduciary, the representative may sue or defend on behalf of the infant . . .. If an infant . . . does not have a duly appointed representative he may sue by his next friend or by a guardian ad litem."

2. The general rule is that an appearance by an attorney for a party creates a presumption that the attorney had authority to act on behalf of such party, and the burden of proving the contrary is upon those who challenge the attorney's authority. *Osborn v. President, Directors and Company of Bank of United States*, 22 U.S. 738, 829, 830, 9 Wheat. 738, 829, 830, 6 L.Ed. 204 (1824); *Danishch v. Guardian Life Ins.*, 151 F.Supp. 17, 19 (S.D.N.Y.1957); *Powerlock Systems, Inc. v. Duo-Lok, Inc.*, 56 F.R.D. 50, 51 (E.D.Wis.1972).

3. *Holmes v. New York City Housing Authority*, 398 F.2d 262, 265 (2d Cir. 1968).

4. ". . . The signature of an attorney constitutes a certificate by him that he has read the pleading; that to the best of his knowledge, information, and believe there is good ground to support it; . . . .. If a pleading . . . . is signed with intent to defeat the purpose of this rule, it may be stricken as sham and false . . . .. For a wilful violation of this rule an attorney may be subjected to appropriate disciplinary action. . . .."

basis in fact. The attorneys, of course, resist the accusation and urge, on the basis of their review of the records of the five children, their interviews with them and their study and general knowledge of conditions in foster care settings, that the allegations are warranted. The challenge to Ms. Lowry under Rule 11 must fail since defendants do not show "beyond peradventure that [the pleading] is sham and false and that its allegations are devoid of factual basis," as this court required[5] in order to invoke the sanctions of Rule 11. This court set that standard because "otherwise it would deprive a party of his right to a trial of the issues posed by his complaint—it would mean trial by affidavits."[6] The information contained in the affidavit submitted by Messrs. Freedman and Awalt, combined with that of Ms. Lowry, in response to this charge, is sufficient to withstand defendants' attack on Ms. Lowry's good faith under the *Murchison* test.[7]

In a further effort to strike the complaint under Rule 11, plaintiffs' attorneys are charged with violating New York State law[8] by their examination of the records of the children in institutional care at Abbott House. However, as already noted, that examination was made under authorization of Abbott House officials. The law contains no prohibition against examination by qualified persons when authorized by the foster care agency.[9] In sum, the court holds that the children, by their "next friend," with Ms. Lowry as attorney, have standing to maintain this action for themselves and on behalf of other children similarly situated.

The movants next urge that the court should decline consideration of the alleged violations of federal constitutional rights because in every instance plaintiffs' claims in fact assert a violation of New York State law governing the protection of children in foster care, the regulation of agencies that provide foster care and the procedures for adoption of children in foster care.[10] While the conduct attributed to defendants may violate state law, this does not foreclose consideration of the federal constitutional claims where the same conduct infringes upon federal constitutional rights.[11]

---

5. *Murchison v. Kirby*, 27 F.R.D. 14, 19 (S.D.N.Y.1961).

6. *Id.*

7. That the claim of delay of placement of children for adoption is not entirely made of whole cloth, *see* Festinger, The New York Court Review of Children in Foster Care, Child Welfare 211 (1975). Moreover, some of the defendants concede, despite their best efforts to have children adopted, they make "no claim that perfection has been achieved in this regard." Joint Reply Memorandum for Certain Defendants in Support of their Motion to Dismiss the Complaint p. 2.

8. Social Services Law, Art. 6, Title 1, § 372.

9. Indeed, movants agree that "it would not be contrary to Abbott House rules, or to New York law, for a responsible official of a foster care agency to permit confidential childrens' records to be examined by an outsider, where the responsible official, in the exercise of his professional judgment, believes that to be in the child's best interest." Movants' Reply Memorandum p. 3. However, the defendants argue that "in permitting the CLU attorneys to examine the files, Mr. Awalt [the executive director] did not exercise a professional judgment." That may well be, but he acted within the scope of his authority, and whether he should have granted authorization to the attorneys to examine the files is a matter of judgment and was within his discretion.

10. Movants, in advancing this contention, acknowledge that "the complaint does not allege any violation of New York law or any question of New York law." But they contend "through a side-by-side summary comparison that each claim of violation of Constitutional right made in the complaint also is a violation of a specific provision of New York law and regulations for the protection of children in foster care." Movants' Reply Memorandum p. 7.

11. Thus, the Supreme Court held in *Monroe v. Pape*, 365 U.S. 167, 183, 81 S.Ct. 473, 482, 5 L.Ed.2d 492 (1961):

"It is no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked (under the Civil Rights Act)."

And this position was reaffirmed in *McNeese v. Board of Educ.*, 373 U.S. 668, 671–72, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1962). *See also McRedmond v. Wilson*, 533 F.2d 757 (2d Cir., 1976).

■ In urging that plaintiffs be relegated to the state courts, in effect the defendants invoke the doctrine of abstention. However, that doctrine is brought into play when state court consideration may put an unresolved question of state law at rest and make unnecessary a ruling on a federal constitutional claim.[12] No such situation has been presented with respect to the state statutes. Moreover, our Court of Appeals has emphasized that in actions brought under the Civil Rights Act "the power of a federal court to abstain from hearing and deciding the merits of claims properly brought before it is a closely restricted one which may be invoked only in a narrowly limited set of 'special circumstances.' "[13]

For all of the foregoing reasons, the motions to dismiss under Rules 11 and 17 are denied. Thus we approach consideration of the merits of the motion to dismiss the complaint joined in by most of the defendants.[14]

## II

### THE MOTION TO DISMISS THE COMPLAINT PURSUANT TO RULE 12(b)(1) and (6) OF THE FEDERAL RULES OF CIVIL PROCEDURE.

The complaint is a prolix document of fifty-eight pages with many allegations, some repetitive and others conclusory. The hard core of all plaintiffs' claims is that defendants, entrusted under state law with the temporary foster care and custody of children who have been abandoned by or taken from their natural parents pursuant to court order or voluntarily surrendered by their parents, have failed expeditiously and vigorously to seek available potential adoptive parents for them and thereby deprived them of an alleged fundamental right to a permanent stable home. This basic claim and others stemming therefrom are alleged by plaintiffs as deprivation of rights guaranteed to them under the First, Eighth, Ninth and Fourteenth Amendments to the Federal Constitution and under Title IV of the Social Security Act.

The defendants challenge that a permanent stable home is guaranteed to a child under any of those constitutional provisions or under the federal statute. They contend that the sole responsibility for providing for children who are deprived of a parental home is a matter of state concern. They emphasize that although plaintiffs purport to assert various claims in violation of alleged federal constitutional rights, in fact the allegations upon which they ground those claims charge defendants with violations of, or attempts to thwart, the comprehensive provisions of New York statutes and regulations governing foster care of children and adoption procedures.

Thus a prime issue is whether a permanent stable home is a fundamental right in the sense it is among the rights and liberties protected by the Federal Constitution. There is, of course, no express provision in the Constitution or the Bill of Rights which guarantees such a right, but the specific guarantees in the Bill of Rights frequently implicate unexpressed rights deemed essential in order to assure their life and substance;[15] oth-

12. *Zwickler v. Koota,* 389 U.S. 241, 248–49, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); *Harman v. Forssenius,* 380 U.S. 528, 534–35, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965); *Davis v. Mann,* 377 U.S. 678, 690, 84 S.Ct. 1441, 12 L.Ed.2d 609 (1964); *McNeese v. Board of Educ.,* 373 U.S. 668, 673–74, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); *McRedmond v. Wilson,* 533 F.2d 757 (2d Cir., 1976); *Fhagen v. Miller,* 312 F.Supp. 323, 327 (S.D.N.Y.1970).

13. *Holmes v. New York City Housing Authority,* 398 F.2d 262, 265 (2d Cir. 1968). *See also Wright v. McMann,* 387 F.2d 519, 525 (2d Cir. 1967).

14. A defendant who did not join in the motion was so outraged by what is termed the complaint's "accusation that the directors of the agencies and their staff have in effect imprisoned the children in their care in order to receive funds for harboring them," that he urged denial of the motion since a trial would permit "certain vindication." Oral hearing pp. 53–54.

15. *Cf. Griswold v. Connecticut,* 381 U.S. 479, 484, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

erwise the specific guarantees may become empty vessels. The plaintiffs contend that an amalgam of the First, Ninth and Fourteenth Amendments, as interpreted by the Supreme Court decisions, impliedly establishes such a right under protected family relationships.

The Supreme Court has recognized that rights "to marry, establish a home and bring up children,"[16] and "to direct the upbringing and education of children,"[17] are "basic civil rights"[18] which are an essential part of the liberty guaranteed under the Fourteenth Amendment. These rights are inherent in the very nature of family life. The Supreme Court "has frequently emphasized the importance of the family"[19] and its entitlement to protection as a fundamental right. Thus, "[t]he integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment . . . the Equal Protection Clause of the Fourteenth Amendment . . . and the Ninth Amendment."[20] And *Roe v. Wade*[21] leaves no room to doubt that a "fundamental" right to freedom of, and privacy in, family life exists, whether derived from the First, Ninth or Fourteenth Amendments, or some combination thereof.[22] That children have the same right as adults to freedom of, and privacy in, family life is abundantly clear from *In re Gault.*[23]

Plaintiffs argue in effect that when a child is deprived of a family life with his natural parents, as a result of which he is placed in temporary community foster care, an essential part of the child's right to a proper family life, which encompasses a right of privacy therein, requires that as expeditiously as possible the child be provided with a permanent stable home to replace the one he has lost. The importance to a child of a permanent stable home and family life, secured in privacy, with a proper environment is self-evident. It is important no less to society than to the child himself. But accepting the importance and social desirability of a permanent stable home and family life for a child does not mandate a federal constitutional right thereto in the child's favor.[24]

The Supreme Court cases cited above and relied upon by plaintiffs, in recognizing the "fundamental" right to freedom of, and privacy in, family life emphasize the right of the individual to live his life free from the state's intrusion absent a compelling interest of the state which justifies overriding that right. Thus, the right to privacy in any aspect of an individual's personal life, including his family life, is protected against state intrusion. And the concept of "family life" permeates the so-called privacy cases only because it is one important example of the various spheres of an individual's personal life which are barred to state intervention.

However, plaintiffs seek not to apply a fundamental right to non-interference in private life to their situation, but rather to extrapolate from that right a com-

16. *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923).

17. *Pierce v. Society of Sisters,* 268 U.S. 510, 534–35, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925).

18. *Skinner v. Oklahoma,* 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942).

19. *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1971).

20. *Id.*

21. 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

22. *Id.* 152–53, 93 S.Ct. 705.

23. 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). The Court held that "neither the Fourteenth Amendment nor the Bill of Rights is for adults alone." *Id.* 13, 87 S.Ct. 1436.

24. Thus, the Court of Appeals, in *Bynes v. Toll,* 512 F.2d 252, 255 (2d Cir. 1975), while recognizing the right of marital privacy and the right of parents to raise their children as they see fit, held that a University which barred children of students from living in on-campus married student housing was "not interfering with the marital privacy of the (married students) or their unquestioned natural right to bring up their children." Rather, the court found that married students "are totally free to procreate and educate their offspring— the only question is whether the University is constitutionally mandated to provide them campus housing to perform their protected prerogatives." *Id.*

pletely different one—the right to a specific type of environment in a "permanent stable home." Further, they seek to impose a constitutional mandate upon a state when in effect it acts in loco parentis to place a child in such a specific environment promptly whenever possible. To require the federal government to enforce the claimed right would mean its intervention in family life; it would require that the federal government create a status of family life for the child when in fact none exists.

 When a plaintiff child was deprived of family life, whether because of shortcomings of its natural parents or otherwise, the state assumed responsibility for its custody and care through authorized agencies. Custody was intended to be temporary with a procedure to carry out a policy of securing for the child adoptive parents in a permanent home, where attainable. But the state's objective is not thereby transmuted into a fundamental right of adoption into a stable and permanent family enforceable under the Federal Constitution.

 Surely adequate, decent, safe and sanitary housing is a component of a full and adequate family life. Yet this has been held beyond the pale of a federally protected fundamental right. Thus, in *Lindsey v. Normet*,[25] the Supreme Court stated:

"But the Constitution does not provide judicial remedies for every social and economic ill. We are unable to perceive in that document any constitutional guarantee of access to dwellings of a particular quality, or any recognition of the right of a tenant to occupy the real property of his landlord beyond the term of his lease without the payment of rent or otherwise contrary to the terms of the relevant agreement. Absent constitutional mandate, the assurance of adequate housing and

the definition of landlord-tenant relationships are legislative, not judicial, functions."

The Supreme Court took a similar view on the issue of a claimed protected right to education. In *San Antonio School District v. Rodriguez*[26] the Supreme Court, adhering to its "historic dedication to public education,"[27] and reiterating its recognition that "education is perhaps the most important function of state and local government . . ." and "it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education,"[28] nonetheless held it did not give rise to a fundamental right, either expressly or implicitly, under the Federal Constitution. The Court rejected the claim despite the strongly pressed contention, and indeed one of substance, that education is a fundamental personal right because it is essential to the meaningful exercise of First Amendment and voting rights. The Court accepted the importance of these values, but decreed they are not "to be implemented by judicial intrusion into otherwise legitimate state activities."[29] If the Supreme Court was unpersuaded by the arguments advanced to support the claim that education was a fundamental right entitled to constitutional protection, it is clear that the contention as to permanent stable home must also fail.

Plaintiffs next argue that even if their claim to a permanent stable home is not upheld as a fundamental right, entitled to federal constitutional protection, nonetheless such a right is derived from federal and state laws and regulations thereunder—one that is protected as a property interest which cannot be denied without due process of law under the Fourteenth Amendment. To sustain this claim, plaintiffs must establish first that the right exists entitling them to due

25. 405 U.S. 56, 74, 92 S.Ct. 862, 874, 31 L.Ed.2d 36 (1972).

26. 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).

27. *Id.* 30, 93 S.Ct. 1278.

28. *Id.* 29–30, 93 S.Ct. 1295, *quoting Brown v. Board of Educ.*, 347 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

29. *Id.* 411 U.S. 36, 93 S.Ct. 1298.

process of law, and second, what kind of due process is required.

■ As to establishing the claimed right, the argument is twofold. First, plaintiffs contend that the members of their class are all in New York's foster care system, either in foster homes, group homes or institutions; that their care is paid for by the city and state governments, most of which are reimbursed by the federal government under Title IV of the Social Security Act; that the purpose of the Act is to "maintain and strengthen family life"; and that to further this objective the federal program is anchored to a policy of permanency, either in the child's natural family home or, if that proves impossible, in a substitute permanent home. Based thereon they argue that they have acquired, under the federal statute, a right to a stable home of which they cannot be deprived without due process of law. The flaw in this syllogism is that neither the federal statute nor the regulations thereunder support the assertion that states receiving federal financial aid for child welfare services are mandated to provide a permanent stable home for the child.[30]

Alternatively, plaintiffs assert an enforceable right to a permanent stable home by virtue of New York State's Social Services Law and Family Court Act and their adoption provisions. New York State has enacted a comprehensive child foster care and adoption program. There can be no doubt, and the defendants readily concede, that the legislative policy underlying this program recognizes that the best interests of children in foster care are served by placing them for adoption in permanent homes if they cannot be returned to their natural parents. But defendants dispute that the statutes give rise to a right enforceable under the umbrella of the due process clause of the Fourteenth Amendment.

The statutes nowhere specifically accord the plaintiffs the right contended for. However, plaintiffs seek to spell out that right from provisions of the state law which make the local public welfare officials responsible for the welfare of all children within local welfare districts,[31] which authorize the local public welfare officers[32] and defendant administrators[33] to accept permanent guardianship of a child from either a court or a child's natural parents for the purpose of having a child adopted and permits them, once having received the full legal custody, to consent to the child's adoption.[34] In addition, plaintiffs assert that New York's policy in favor of placing children in adoptive permanent homes is underscored by a statutory plan for subsidized adoptions so that more

---

30. Plaintiffs rely on sections of Title IV and regulations promulgated thereunder which merely indicate that the federal government recognizes adoption as one alternative appropriate for children receiving aid in the form of foster care under Title IV. Thus, for example, section 625 does not even mention adoption but simply defines the term "child-welfare services" to mean:

"Public social services which supplement, or substitute for, parental care and supervision for the purpose of . . .
. . . . (2) protecting and caring for homeless, dependent, or neglected children, . . . and (4) otherwise protecting and promoting the welfare of children, including the strengthening of their own homes where possible or, where needed, the provision of adequate care of children away from their homes in foster family homes or day-care or other child-care facilities."

Plaintiffs also place particular emphasis on the regulation, 45 C.F.R. § 220.19, which provides:

"[S]ervices must be provided for children receiving aid in the form of foster care under Title IV—part A to: (d) Improve the conditions in the home from which the child was removed, so that the child may be returned to his own home, or otherwise plan for the placement of the child in the home of other relatives, adoptive home, or continued foster care, *as appropriate*." (emphasis added)

However, this regulation clearly leaves the choice of placement to the state and, furthermore, regulation 45 C.F.R. § 220.62 specifically provides that the state is to determine the need for caring for children in foster care settings and to determine "that the type of care is in the best interests of the child."

31. New York Social Services Law, Art. 6, Title 2, § 395 et seq.

32. *Id.* § 398(6)(f).

33. *Id.* Title 1, § 384.

34. *Id..*

low income families can provide such homes.[35] Finally, they emphasize that under the terms of an agreement entered into by the New York City and defendant agencies, the importance of adoption as second only to a child's return to his natural home is stressed.[36]

Upon the totality of the foregoing, plaintiffs contend the state has granted, and they have acquired, a right to be adopted into a permanent stable home, of which they cannot be deprived without due process of law. However, these are slender reeds upon which to rely to spell out entitlement to a right enforceable against the state. The various provisions of the State Social Services Law and Family Court Act set up the machinery to facilitate adoption in those instances where adoptions are feasible. Each adoption presents individual problems related to the particular child, its natural parents and its proposed adoptive parents. As defendants point out, adoption requires adoptable children and families willing and able to take children into their homes, which obviously varies from case to case.

For plaintiffs to acquire the right contended for, so that it is a protected "property" interest under the Fourteenth Amendment, it must appear that the state intended to confer that right. Once conferred its deprivation requires compliance with procedural due process. Accordingly, such cases as *Goss v. Lopez*[37] (school suspension), *Wolff v. McDonnell*[38] (cancellation of good-time credits), *Perry v. Sindermann*[39] (non-tenured college employment), *Morrissey v. Brewer*[40] (revocation of parole), *Fuentes v. Shevin*[41] (replevin of property), *Goldberg v. Kelly*[42] (welfare payments), *Sniadach v. Family Finance Corporation*[43] (wage garnishment) and *Slochower v. Board of Education*[44] (discharge from public employment), so heavily relied upon by plaintiffs are inapplicable. In each instance the claim of protected interest, whether liberty or property, was either clearly created and defined by state law or implicated a protected right such as freedom of speech or association, or arose from mutually explicit understandings or was derived from the existence of policies and practices promulgated by state officials and recognized by state law. Such is not the case here.

But even if, contrary to the court's view that the state did not either expressly or impliedly confer a right of permanent adoption protected by the Fourteenth Amendment, it is assumed plaintiffs acquired that right, nonetheless due process requirements are satisfied under existing state law. Plaintiffs assert that they and members of their class are children for whom a return to their natural parents is no longer a possibility, children who are either legally free for adoption[45] or who would be free

**35.** *Id.* Title 2, § 398(6)(k).

**36.** Subsection A of Section VII of the contract presently in effect between the City of New York and the defendant agencies pursuant to N.Y. Social Welfare Law §§ 395, 398.6(g) and Section 603–2.0 of the City's Administrative Code states, in part, at page 13:

"The goal of the Agency shall be the best possible permanent plan for the Child. The plan of choice shall be the rehabilitation of the family so that the Child can return to his natural home. If return home is not possible, the goal of the Agency then shall be the Adoption of the Child. If Adoption is contraindicated, the Agency shall specify . . . the reasons Adoption cannot be accomplished."

**37.** 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975).

**38.** 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

**39.** 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

**40.** 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

**41.** 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972).

**42.** 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

**43.** 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969).

**44.** 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956).

**45.** A child is legally free for adoption when his natural parents' claims to custody are permanently severed under the law. The natural parents may consent to such a divestment of

if appropriate legal action were initiated by defendants. In the instance of both groups the state mandates a periodic review by the Family Court for every child in foster care. A child in state custody upon a Family Court order removing him from his natural home because of parental abuse or neglect, is placed temporarily for an initial period of eighteen months.[46] At the expiration of that period, the court may "upon a hearing, make successive extensions for additional periods of one year each."[47] The more generally applicable provision for foster care review is Section 392 of the Social Services Law which requires the foster care status of each child to be reviewed by the Family Court after every eighteen-month period of continuous foster care.

The review procedure reflects the state's concern to assure a child who is in foster care where possible the opportunity to grow up in a permanent home and to enjoy the attributes of family life with his natural parents, or if that is not feasible, with adoptive parents.[48] Toward this end the foster care agency entrusted with the care and custody of the child must present a petition to the Family Court. The petition sets forth pertinent facts as to the child with a proposed disposition and grounds therefor.[49] The Family Court is required to make a disposition "in accordance with the best interest of the child."[50]

Notice of the hearing thereon is required to be given to the authorized agency charged with the care, custody or guardianship of the child if the agency itself is not the petitioner; to the foster parents of the child in whose home the child resides or has resided during the eighteen months; to the parent or guardian who transferred the care and custody of the child temporarily to the agency; and to such other persons as the court in its discretion may direct, all of whom are parties entitled to participate in the proceeding.[51] The court also in its discretion may dispense with the child's attendance at the hearing or may, with the consent of the parties, dispense with a hearing and make a determination upon the papers and affidavits submitted to the court.[52] Upon conclusion of the hearing the court enters an order based upon findings supporting its determination that the disposition is in the child's best interests. In the court's order of disposition the law permits several alternatives, which may include continuance of foster care, return of the child to the parent, guardian or relative, institution of proceedings to legally free the child for adoption, or a direction to place the child for adoption in the foster home where he resides or with any other person or persons.[53] In substance, the hearing is a fact-finding inquiry centered about the child's best interests. Under the law cases must be reviewed every eighteen months where the child continues in foster care.

The plaintiffs challenge the adequacy of the review procedure. They emphasize that the Family Court Judge may dispense with either the child's attendance at the hearing or the hearing itself and make a disposition upon the papers presented. Plaintiffs contend that this is a deficiency, which is compounded by

their interests by "surrender" of the child to an authorized agency for adoption. New York Social Services Law, Art. 6, Title 1, Section 384. However, even if the natural parents do not so consent, the child may be freed by the New York State Family Court under the Family Court Act, Art. 6, Part 1. This statute provides for a "proceeding permanently to terminate the parent's or other custodian's custody," Section 614, upon the court's adjudication that the child is "permanently neglected" under Section 611.

**46.** New York Family Court Act, Art. 10, Part 5, § 1055(b).

**47.** *Id.*

**48.** *In re P,* 71 Misc.2d 965, 337 N.Y.S.2d 203, 207 (Family Ct.1972) (Justine Wise Polier, J.).

**49.** New York Social Services Law, Art. 6, Title 1, § 392(2) and (3).

**50.** *Id.* § 392(7).

**51.** *Id.* § 392(4).

**52.** *Id.* § 392(6).

**53.** *Id.* § 392(7).

the fact that the statute contains no provision for the appointment of and representation by counsel for the child. This approach views the periodic review procedure as an adversary proceeding where the child's interests may be in conflict with those of his natural parents, foster parents or the child welfare agency. However, the adjudicative issues with respect to such conflicts, if any, were previously decided when the child was placed in foster care.

■ Due process is a relative term, and what kind of a hearing is required depends upon the particular situation at issue and the interests involved.[54] Also to be borne in mind is that the term "hearing" is "a verbal coat of too many colors,"[55] which has been broadly defined as "any oral proceeding before a tribunal."[56] Judge Friendly is of the view that in some circumstances a "hearing" may be had on written materials only.[57] Such a procedure is justified in the instant case. It is "appropriate to the nature of the case."[58] Some of these child plaintiffs were committed to foster care when infants. The disposition to be made by a Family Court Judge in the best interests of a child who may be of tender age hardly requires that a lawyer be assigned to confer with the particular child in each instance to obtain and thereafter present to the court the child's views as to his best interests, or that the lawyer at a hearing question the participants in the proceeding. That is the function of the Family Court Judge.

This situation is quite different when the state seeks to take the child from its natural parents. A child who is alleged by the state to be neglected, abused or wayward may have interests which clash with those of his parents who, though neglectful of the child's well being, may

nonetheless seek to retain his custody, or the child's interests may be at odds with those of the state in seeking to take over his custody because he may believe that he should be allowed to remain with his parents.

Here, under adequate state procedure, the child is already in temporary foster care and custody. The sole issue that remains is what his best interests require, whether continued foster care, return to his parents, initiation of proceedings to legally free him for adoption, adoption by his foster parents or with other suitable persons. The Family Court Judge makes that determination based upon the record presented to him and articulated by findings supporting the determination. Considering the purpose of the state's periodic review procedure, under all the circumstances it satisfies due process requirements.

■ The plaintiffs, still pursuing constitutional claims, advance what they term a substantive due process right to an adoptive home. The argument, as this court understands it, is that once the state has taken a child in its temporary custody because of the parents' dereliction and assumed responsibility for his welfare, the state's retention of custody and its continued failure to place him with a permanent substitute family is unrelated to the purpose for which the state assumed temporary custody of him. The argument proceeds that the child is in foster care because his parents have denied him a permanent family life; that the treatment to overcome this defect is to move him out of foster care into a permanent home; that the state's custody of him is only intended to continue until such a home can be found; and that the failure to afford the child a permanent home constitutes a denial of

**54.** *Boddie v. Connecticut,* 401 U.S. 371, 378, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971).

**55.** *United States v. Tucker Truck Lines, Inc.,* 344 U.S. 33, 39, 73 S.Ct. 67, 70, 97 L.Ed. 54 (1952) (Frankfurter, J., dissenting). *See also United States v. Florida East Coast Ry.,* 410 U.S. 224, 239, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973) (Rehnquist, J.).

**56.** 1 K. Davis, Administrative Law Treatist § 7.02 at 413 (1958).

**57.** Friendly, J., "Some Kind of Hearing", 123 U. of Penn. L.Rev. 1270 (1975).

**58.** *Armstrong v. Manzo,* 380 U.S. 545, 550, 85 S.Ct. 1187, 1190, 14 L.Ed.2d 62 (1965).

due process of law. In sum, the contention is that the state's role of parens patriae carries with it a co-relative duty to furnish treatment,[59] which in this instance, plaintiffs say, is placement in permanent family life. This concept is bottomed on the recently developing right to treatment cases involving indefinite commitments.[60]

The attempt to equate the child plaintiffs' status while in the foster care of the state with those who are taken into custody under a civil commitment because of mental illness, physical retardation, incorrigibility or similar causes, is somewhat farfetched. The civilly committed have been deprived of their liberty by the state while the state's action in taking the child plaintiffs into foster care, whether with an institution or foster parent, is not a deprivation of liberty. The state has merely provided a home for them in substitution for the one the parents failed to provide. To keep them under substitute guardianship is not a denial of treatment.

The same considerations require rejection of plaintiffs' collaterally related argument that continued custody of the children constitutes cruel and unusual punishment in violation of the Eighth Amendment. It is true that protection under this Amendment is not restricted to criminal situations but also applies to mere confinement. Here, as already indicated, the children have been provided a home to make up for the parents' failure to do so; they are not in confinement,[61] although to be sure those in institutional custody are subject to discipline and restrictions.

In any event, confinement or restrictions, to be designated cruel and unusual punishment, must be "characterized by conditions and practices so bad as to be shocking to the conscience of reasonably civilized people,"[62] or must exceed the "limits of civilized standards."[63] As noted, plaintiffs do not question the living conditions in their foster homes. Rather, they contend, to use their term, that the "continued confinement," even in comfortable foster homes, is, ipso facto, cruel and unusual punishment as long as permanent adoption is a viable alternative. This disingenuous attempt to expand plaintiffs' rights under the Eighth Amendment is without substance.

Plaintiffs' final constitutional claim is related to the non-white plaintiffs of the class. Here a cause of action is advanced on behalf of this sub-class under the equal protection clause of the Fourteenth Amendment. The charge is that defendants systematically treat non-white children in their care and custody differently than white children. The allegations are somewhat ambiguously stated and indeed could be clarified. But interpreted liberally, the charge is that defendants follow a practice and policy of (1) evaluating non-white children as unadoptable more often than they do so for white children, thus making it less likely that a non-white child will be referred for adoption;[64] (2) applying more often arbitrary and unrealistic and irrelevant screening standards and procedures to non-white potential adoptive parents, thus limiting the availability of non-white adoptive homes for non-white children;[65] (3) not referring

**59.** See Martarella v. Kelley, 349 F.Supp. 575, 600 (S.D.N.Y.1972), quoting Kittrie, "Can the Right to Treatment Remedy the Ills of the Juvenile Process," 57 Georgetown Law Journal 848, 851–52 (1969).

**60.** See e. g., Martarella v. Kelley, 349 F.Supp. 575, 599 (S.D.N.Y.1972); Wyatt v. Stickney, 325 F.Supp. 781, 785 (M.D.Ala., N.D.1971). But see New York State Ass'n for Retarded Children, Inc. v. Rockefeller, 357 F.Supp. 752, 761–62 (E.D.N.Y.1973).

**61.** See Martarella v. Kelley, 349 F.Supp. 575, 597 (S.D.N.Y.1972).

**62.** Martarella v. Kelley, 349 F.Supp. 575, 597 (S.D.N.Y.1972); Holt v. Sarver, 309 F.Supp. 362, 373 (E.D.Ark.1970).

**63.** Trop v. Dulles, 356 U.S. 86, 100, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958).

**64.** Complaint ¶ 144.

**65.** Complaint ¶ 147.

non-white children to white adoptive parents, even when there are white parents appropriate for such adoption, thereby limiting the availability of adoptive homes for non-white children.[66]

The defendants seek dismissal of this claim upon the ground that in New York City more non-white children will be found non-adoptable because there are more non-white children in foster care, which they say is the consequence of the demographic situation not brought about by them. Thus they emphasize that if a disparate situation in placement for adoption exists, it is attributable to cultural, social and economic variables. They argue even if a de facto situation exists, the complaint is deficient because it does not charge the defendants with purposeful or intentional discrimination, and the mere fact that there is a disparity in the number of whites vis-a-vis non-whites found to be adoptable does not per se assert a claim of purposeful discrimination. The defendants here rely upon such cases as *Keyes v. School District*[67] and *Snowden v. Hughes*.[68] However, whatever uncertainty may have existed previously, it is now clear "that racial discrimination need not be intentional or purposeful to state a claim under [the equal protection

clause]."[69] The defendants' position goes to the merits of the claim. Whether plaintiffs can prove the facts necessary to establish "that harsh racial impact, even if unintended [which], amounts to an invidious *de facto* classification that cannot be ignored or answered with a shrug,"[70] and if so, whether defendants, in going forward can establish justification, whatever the applicable standard—a "compelling state interest" or a "rational relationship test"[71]—are not proper questions on a motion to dismiss. Thus, of all the constitutional claims asserted, only the denial of equal protection of the laws is sufficient to withstand the challenge under Rule 12(b). It necessarily follows that plaintiffs' claim under 42 U.S.C., section 2000d,[72] the allegations of which track those under the constitutional claim of equal protection of the laws, is also sufficient to withstand defendants' motion to dismiss.[73]

In sum, the only causes of action that survive are the constitutional claims brought under sections 1983 and 1985 of the Civil Rights Act[74] on behalf of the subclass of non-white children alleging denial of their right to equal protection of the laws and the statutory claim under section 2000d of Subchapter V of the

66. Complaint ¶ 148.

67. 413 U.S. 189, 208, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973).

68. 321 U.S. 1, 8, 64 S.Ct. 397, 88 L.Ed. 497 (1944).

69. *Chance v. Board of Examiners,* 458 F.2d 1167, 1175–76 (2d Cir. 1972); *Kennedy Park Homes Ass'n v. City of Lackawanna,* 436 F.2d 108, 114 (2d Cir. 1970), *cert. denied,* 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971). *Accord, Bridgeport Guardians, Inc. v. Bridgeport Civil Service Commission,* 482 F.2d 1333, 1336 (2d Cir. 1973), *cert. denied,* 421 U.S. 991, 95 S.Ct. 997, 44 L.Ed.2d 481 (1975); *Vulcan Society of New York City Fire Dept. v. Civil Service Commission,* 490 F.2d 387, 391–92 (2d Cir. 1973).

70. *Chance v. Board of Examiners,* 458 F.2d 1167, 1175 (2d Cir. 1972).

71. *Id.* 1177.

72. Section 2000d provides:

"No person in the United States shall, on the ground of race, color, or national origin,

be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

73. *Goodwin v. Wyman,* 330 F.Supp. 1038, 1040 (S.D.N.Y.), *aff'd,* 406 U.S. 964, 92 S.Ct. 2420, 32 L.Ed.2d 664 (1972).

74. Defendants argue that, even if the complaint is found to state a claim for denial of plaintiffs' constitutional rights sufficient to warrant injunctive relief under sections 1983 and 1985 of the Civil Rights Act, plaintiffs have failed to allege the minimum required to support a claim for damages under these sections. Thus, defendants seek to invoke, as to all the defendants, including the agency administrator defendants, the qualified "good faith" immunity from private actions for damages presently recognized for certain public officials. *Wood v. Strickland,* 420 U.S. 308, 321–22, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). Whatever the merits of this defense, the question is not one to be resolved on this motion to dismiss. As the Supreme Court held in

Civil Rights Act, based upon the same allegations.

The defendants' motion to dismiss all other alleged causes of action is granted.

*Scheuer v. Rhodes,* 416 U.S. 232, 250, 94 S.Ct. 1683, 1693, 40 L.Ed.2d 90 (1974), "[t]he documents properly before [this Court] at this early pleading stage specifically placed in issue whether the [defendants] were acting within the scope of their duties under the Constitu-tion; . . . and whether they acted in good faith . . . ." Thus, "the complaining parties are entitled to be heard more fully than is possible on a motion to dismiss a complaint." *Id.*