Marilyn SEIDE, Ellen Dines, Carol P. Horn, William Hetzer, Charles H. King, Judith Lang and Carol O'Neill, as members of the Board of Visitors of Manhattan Children's Psychiatric Center, individually and on behalf of all patients at Manhattan Children's Psychiatric Center, Barbara J. Robinson, on behalf of her daughter, Barbara E. Robinson, individually and on behalf of all patients at Manhattan Children's Psychiatric Center, and Rose Lange, on behalf of her son, John Lange, individually and on behalf of all patients at Manhattan Psychiatric Center, Plaintiffs,

v.

James A. PREVOST, as Commissioner of the New York State Office of Mental Health, Barbara Blum, as Commissioner of the New York State Department of Social Services, James A. Krauskopf, as Commissioner of the New York City Human Resources Administration, Robert Trobe, as Deputy Administrator of the New York City Human Resources Administration Office of Adult and Family Services, and Volunteers of America, Inc., Defendants,

and

Gilbert Watkins, on his own behalf and on behalf of all persons similarly situated, Intervenor-Defendant.

No. 81 Civ. 6205 (RWS).

United States District Court,
S. D. New York.

March 19, 1982.

Mortimer Todel, New York City, for plaintiffs.

Robert Abrams, Atty. Gen., New York City, for state defendants; Howard L. Zwickel, Stephen M. Jacoby, Asst. Attys. Gen., New York City, of counsel.

Frederick A. O. Schwarz, Jr., Corp. Counsel of City of New York, New York City, for city defendants; George Gutwirth, Corp. Counsel, New York City, of counsel.

Robert M. Hayes, Coalition for the Homeless, New York City, for intervenor defendant.

## OPINION

SWEET, District Judge.

This is a class action for injunctive relief pursuant to 42 U.S.C. § 1983 alleging deprivation of rights guaranteed by the Eighth and Fourteenth Amendments and by the New York Constitution, Article XVII, §§ 1, 3, 4, 6, New York Mental Hygiene Law §§ 7.07 and 33.03, and 14 N.Y.C.R.R. § 27.-4(b).[1] Jurisdiction is based on 28 U.S.C. §§ 1343 and 1651.

*The Parties*

Marilyn Seide and six other named plaintiffs (referred to collectively hereafter as "Seide") initiated this action as members of the Board of Visitors of the Manhattan Children's Psychiatric Center ("MCPC"), a State facility on Ward's Island, and on behalf of the children who are patients at MCPC. The Board is a body created by State law, New York Mental Hygiene Law, § 7.33, whose members are appointed by the Governor to advise the director of a State mental care facility concerning conditions, plans, programs and activities, and to make recommendations to the Governor, the Commissioner of the Office of Mental Health ("OMH"), and the Chair of the State Commission on the Quality of Care for the Mentally Disabled. Seide was joined by Barbara T. Robinson, the mother of a patient at MCPC and Rose Lange, the mother of a patient at the Manhattan Psychiatric Center ("MPC"), which is also on Ward's Island. Each parent sues on behalf of the patients at the respective facilities in which their children are being treated.

1. Although the complaint alleges violations of New York law, plaintiffs have not introduced evidence pertaining to New York statutes but have concentrated on federal constitutional claims. The causes of action setting forth the State claims therefore are dismissed for want of proof and this court does not reach any conclusions concerning New York law.

The State defendants are James A. Prevost, the Commissioner of OMH, and Barbara Blum, the Commissioner of the New York State Department of Social Services ("DSS"). The City defendants are James A. Krauskopf, the Commissioner of the New York City Human Resources Administration ("HRA") and Robert Trobe, the Deputy Administration of HRA with responsibility for the Office of Adult and Family Services. The Volunteers of America, Inc. ("VOA") is a non-profit organization, which operates the Keener Building, a shelter for homeless men on Ward's Island, under contract with the City. Gilbert A. Watkins ("Watkins") intervened on behalf of himself and a class of homeless men who have or are receiving shelter at Keener.

*The Issues Presented*

The proceedings in this action, shortly to be described, have presented in the form of constitutional litigation a series of profoundly disturbing issues facing our society:

What is the extent of the responsibility of our State for mentally disturbed adolescents and adults, both committed and uncommitted?

What is the extent of the City's responsibility for homeless men and does the discharge of this responsibility respect those treated by the State as mentally disturbed?

Does the failure of the community to accept these groups in their midst create an issue which is appropriate for resolution in the federal court?

The posing of these questions in lay terms etches the fundamentally political nature of this controversy, which has in addition its sociological, economic and ethnic aspects. The Supreme Court raised a similar question in *O'Connor v. Donaldson*, 422 U.S. 563, 575, 95 S.Ct. 2486, 2494, 45 L.Ed.2d 396 (1975).

May the State fence in the harmless mentally ill solely to save its citizens from exposure to those whose ways are different? One might as well ask if the State, to avoid public unease, could incarcerate all who are physically unattractive or socially eccentric. Mere public intolerance or animosity cannot constitutionally justify deprivation of a person's physical liberty.

The mentally disturbed and the homeless, although not incarcerated, have been rejected by the community of the City and are now pitted against one another in a contest for the isolated turf of Ward's Island. The State and City have supported the position of the homeless men under the compulsion of a consent agreement after a preliminary injunction was entered by the Supreme Court of the State Court of New York, County of New York, by the Honorable Richard Wallach. *Callahan v. Carey*, No. 42582/79 (Sup.Ct.N.Y.Co., Aug. 26, 1981) (the *Callahan* action).

In this court, the plaintiffs seek a declaration of constitutional rights, which would include an injunction to terminate the existing and proposed use of the Keener Building as a shelter for homeless men, as well as the construction contracts let by the City with the required Board of Estimate approval to expand that facility. Of course, the issues thus presented must be dealt with in the traditional terms of standing, abstention, the definition of constitutional rights, expressed in findings of fact and conclusions of law. Before doing so, however, I am compelled to note the poignancy of the position of these populations, each to a very large extent the product of the swift, conflicting currents of our society, each without a political constituency to which they can refer their suffering, each driven to resort to the courts for enforcement of constitutional and state rights to achieve humane treatment at the hands of the society. While the impropriety of judges determining social policy is frequently sounded by those with loud trumpets, nonetheless, in the context of the needs of the homeless and the mentally disturbed, it is the court that must decide the issues brought before it and seek to achieve a just result and do so promptly. Despite the intricacy of the social issues involved, I conclude that here as in other areas, it is better to have a court resolution than none at all. To proceed with the necessary legal

analysis without a recognition of social and political issues involved would be to ignore the obvious. What follows then is a description of the proceedings previous to this judgment, the findings of fact and the conclusions of law, which taken together, require that judgment be entered dismissing the complaint and denying the plaintiffs the relief which they have sought.

## PRIOR PROCEEDINGS

Although not a part of these proceedings, consideration must be given to the *Callahan* action referred to above, a class action brought on behalf of homeless men seeking to achieve shelter for them. Skilled counsel for Watkins also represents the class plaintiffs in *Callahan*. Although invited, the plaintiffs declined to intervene in *Callahan*. On August 26, 1981, after preliminary proceedings and the active participation of the court and a number of high ranking State and City officials, a consent judgment was entered, requiring the City, among other things, to shelter all the homeless men seeking shelter. The Keener Building was one of the subjects of the consent judgment, but its capacity remained in dispute. A seven day mini-trial was held in which the capacity of Keener was determined and thereafter the capacity of 419 under normal usage and 450 under emergency conditions was inserted in the consent judgment.

On October 7, 1981, the plaintiffs initiated this action and by order to show cause sought a temporary restraining order against the City and State defendants and VOA to enjoin the continued operation of the construction of an addition to the building, to require them to enclose the Keener Building with an opaque barrier, to provide a separate access roadway to the Keener Building, to provide separate private transportation to and from the Keener Building, and to enjoin defendants from providing the men with tokens for use on public buses. In addition, the plaintiffs sought to enjoin the State defendants from issuing any license to the City defendants and VOA to operate the Keener Building, and additionally, to require all defendants to station security officers at the MCPC and at the Keener Building.

This court, having been assured that the parties would agree to interim measures to promote the physical security of the MCPC, denied the temporary restraining order, granted plaintiffs leave to renew if conditions warranted, and scheduled a hearing on November 2, 1981 to consider the application for a preliminary injunction, having ordered discovery on an expedited basis. On October 26 and 27, 1981, City and State defendants filed motions to dismiss the complaint. On November 2, 1981, VOA filed a motion for an order pursuant to Rule 21, Fed.R.Civ.P. to sever the claims against VOA. Additionally, on November 3, 1981, Watkins filed a motion to intervene on his own behalf and on behalf of homeless men sheltered at Keener. Additionally, Watkins answered and counterclaimed.

These motions were heard on November 20, 1981. In an opinion dated November 24, 1981, Watkins' application to intervene was granted. In an order dated December 16, 1981, VOA's motion to sever was granted. This court reserved decision on the motion to dismiss. Additionally, Seide's motion for class certification was submitted on December 18, 1981, and decision was reserved.[2] The hearing on the preliminary injunction was consolidated with the trial on the merits in accordance with Rule 65(a)(2), Fed.R. Civ.P. and concluded on December 21, 1981 after 14 days of testimony during which 26 witnesses testified.[3] The post trial briefs were fully submitted on February 10, 1982.

---

2. Since the complaint is dismissed, it is not necessary to consider plaintiffs' motion for class certification.

3. Pursuant to Fed.R.Civ.P. 65(a)(2) this court consolidated the trial on the merits with the preliminary injunction hearing. After ten days of testimony, the court directed direct testimo-ny to be submitted by written narrative followed by cross-examination. Although the practice impacted the defendants more than the plaintiffs since it was initiated after the testimony of ten witnesses, it was within the court's discretion to regulate the conduct of the trial.

Upon the findings and conclusions set forth below the defendants' motion to dismiss and plaintiffs' motions for class certification, for the preliminary injunction, and for injunctive relief on the merits are hereby denied, and judgment will be entered dismissing the complaint. Watkins stipulated to severance of his counterclaims on December 21, 1981.[4]

### Findings of Fact

*The History and Physical Setting of the Institutions*

The MPC and the MCPC are psychiatric hospitals on Wards Island in New York County, operated as State facilities by OMH. Wards Island, located in the East River between Manhattan and Queens, is connected to Manhattan by a footbridge at East 103rd Street and by access road from the Triborough Bridge. The Island is owned by the City, which has, pursuant to statute, leased property on the island to the State. MPC and MCPC are on property which has been leased to the State, as is the Keener Building.

Among the several buildings that comprise MPC are three residential facilities—Meyer, Dunlop, and Kirby—a rehabilitation center, and a staff residence. Additionally, there are areas for outdoor recreation, including a Roman Garden. The Kirby Building is in the process of becoming a forensic psychiatric hospital, a highly secure facility for individuals who are not able to stand trial or who are not guilty of criminal activity by reason of insanity. Presently, there is an alcoholism unit in the Kirby Building.

A main building and four cottages comprise the MCPC. The main building houses the administrative offices and serves as an educational, treatment and indoor recreation center for both the in-patients and the day-patients. The four cottages are residences for the children who are grouped in terms of age and disability. Additionally, the MCPC has outdoor recreation areas and shares some of the recreational facilities at the MPC.

Since December 1979, the Keener Building, which is located approximately ninety yards across the street from the MCPC at the southern tip of Ward's Island, has operated as a shelter for homeless men pursuant to an agreement between the State and the City. Prior to this date, the Keener Building had been operated at different intervals as a reception center for mentally retarded children and from 1963 to 1971, as a treatment center for drug addicted persons. The City is presently expanding the facility to accommodate up to 950 persons, including 100 staff. There will be dining facilities and in-take facilities in the new building at a cost of $6.8 million dollars. The expanded building is planned to be completed by April or May of 1982.[5]

The costs for the expansion were presented to the Board of Estimate on July 23, 1981, and opposed by several of the plaintiffs and former counsel for plaintiffs, Mr. Horn. The expansion was approved by vote of 8 to 1. As of October 7, 1981, building was well under way, and contract commitments had been made totaling some $2.3 million. In addition, all of the costs of materials were committed.

The State has requested a security fence around the entire Keener complex, a visual barrier, a greenery screen, a separate transportation system for the homeless men and a separate access road. The City has already agreed to all of these proposals except the separate access road, which is under discussion. A separate transportation system was set up in early December. The Keener complex will be enclosed by two security fences, with 1 inch diamond mesh, curved at the top. There will be an opaque

---

**4.** A conference will be held on April 27, 1982 at 4:30 p. m. in Courtroom 302 to resolve the issues raised in the counterclaims.

**5.** Although Keener has operated since December of 1979, it is apparent that the increased concern resulted at about the time of the discussion of its expansion in mid-1981. Of course, it may well be that it was only then that staff and plaintiffs focused upon a pre-existing situation. Indeed, the MPC security records reflect 3,445 patient incidents in 1980 and 2,346 such incidents in the first 8 months of 1981, none of which involved Keener residents.

covering surrounding one of the fences to limit visual perception from the MCPC.

*The Character and Treatment of the Populations Involved*

An in-patient population of the MPC is about 1,300 with an out-patient population of about 2,000 and a staff of 1,100. The patients include those who are mentally disturbed individuals as well as mentally retarded persons, those voluntarily admitted as well as those involuntarily committed. Most of the patients come from Manhattan. Some need long-term care, and some have acute treatment needs.

As is customary in State psychiatric hospitals, MCP provides a variety of treatment programs—alcoholism, retardation, in-patient, out-patient and the planned forensic unit. Each unit is maintained separately but coexists in the vicinity of other programs, some sharing common facilities and recreation areas. Depending on the patients' needs and progress, grounds privileges and furloughs are available as is out-patient treatment and deinstitutionalization. Expert testimony established that psychiatric patients as a group have a history of more violent outbursts than the general population.

There are approximately 273 persons who staff the MCPC and provide services for some 80 in-patients and about 55 day-patients all of whom are below the age of 19. The patients are primarily from Manhattan. Although most children are voluntarily admitted by their parents, some are committed involuntarily. The Special Treatment Team ("STT") in Cottage 1 houses the most seriously disturbed children, who receive instruction and treatment within the cottage. The children in the other cottages attend classes in the main building and may interact with the day-patients. Many children who attend school at MCPC are unable to function in the normal school setting. Although some children receive furloughs and participate in group trips to such places as Yankee Stadium and the theater, there are no unescorted grounds privileges.

The psychiatric diagnosis of the children in the STT unit, Cottage 1, covers a broad range of problems, including childhood psychosis and schizophrenia, combined with organic brain deficits and mental retardation. They often come from families with a history of child abuse.

The over four hundred men who reside in the Keener Building arrive there after applying to the Third Street intake shelter where some processing takes place. (Eligibility is determined by a finding that the individual is not on public assistance.) Transportation is provided by VOA or through public transportation. Those at Keener are a heterogenous lot, and reliable information about their background is difficult to come by. Although there is no record of the average stay at Keener, according to one survey, forty percent of the men were at Keener over sixty days.

The administrator of Keener testified that he believed the average age of the residents was thirty-two, a figure disputed by an expert witness in statistics who believed the figure to be higher. On all the evidence presented I find that the average age was in the range of between thirty-five years and forty years. The stereotype of the middle-aged, alcoholic drifter is no longer appropriate. The population is younger and more nearly represents the ethnic mix of the poverty portion of the general population. Those most familiar with the homeless men stated that they tend to be passive and withdrawn and include those who have chronic illnesses, both physical and mental, including various addictions, particularly alcoholism.

A professional staff of social workers at Keener interviews those who have engaged in some aberrant activity or possess a characteristic which is observed or is the subject of complaint. The staff refers only about fifteen to twenty percent of the men so interviewed to an OMH Assessment Team for assessment of psychological disability. About 1,500 shelter clients have been evaluated altogether, not all of whom were at Keener. The Assessment Team began operation in February, 1981, and issued a six month report indicating that fifty percent of the total shelter population they saw (not

simply the men at Keener) had a history of prior State hospitalization, and forty-eight percent had a history of City hospitalization, and that there was an overlap in the two categories, and that roughly seventy-five percent had some such history.

On the other hand, for reasons not identified in the testimony, the number and percentage of men whom the Team believed required State hospitalization was reduced after the first eight months of its operation. Thus, in February and March, 1981, twenty-six percent of the men assessed were referred for State psychiatric hospitalization. By September and October, 1981, roughly ten percent were similarly referred. Moreover, some forty-three percent of the men assessed in September and October were determined not in need of any mental health services.

During the first six months, one-half of the men assessed stated that they had some prison background although the significance and reliability of this statistic is questionable. Some twenty to thirty percent of the persons evaluated had a history of alcohol abuse, and roughly twenty percent had a history of drug abuse. The head of the OMH Team testified that the shelter clients basically lack energy, tend to stay among themselves, are isolated, do not develop relationships with each other and do not show tendency towards sexual abuse, especially abuse of children. Their fighting was primarily restricted to in-fighting over territorial matters such as obtaining a bed or a place in the food service line.

*Security and its Significance*

Fifty-four Institutional Safety Officers are employed to provide security for both the MPC and MCPC. Each safety officer is assigned to a post, and on any given shift there may be up to fifteen officers on duty. A safety officer is posted at the guard house where all vehicles enter the state facility, and a check is made. A safety officer is also positioned by the East River footbridge. A booth and a fence demarcate the state campus. The footbridge is now closed from 10 P.M. to 6 A.M., and an employee of VOA is also stationed there twenty-four hours to assure that Keener men do not use the footbridge.

Since inception of this lawsuit, a security guard has been posted full-time, seven days a week, at the main entrance to the MCPC. Prior to this time, MPC provided a guard for one shift a day, subject to availability. There are also security personnel posted in all the buildings of the MPC, at the Fire House on the Island, and in the security office. Additionally, there is a patrol car which circles the State campus. Whenever an incident is reported, which can occur simply by dialing a number, a central office determines how many officers should respond, and officers are dispatched, based on their proximity to the scene, the nature of their post, and the availability of other officers. The response time is usually within five minutes.

In 1976, safety light poles were installed along the perimeter road separating the MCPC from the City park and lighting was installed in the main courtyard in 1979, and at the bus stop. Moreover, additional security lighting for the entire facility at a cost of $500,000 has been approved.

Each cottage at MCPC has safety screens in the windows of the childrens' bedrooms. The doors of the cottages are locked at night with special locks. Shortly, all of the windows in Cottage 1 will have safety screens. There is staff present in the cottages on a twenty-four hour basis, and the children are escorted between the cottages and the main building.

The perimeter of the MCPC is enclosed by an eight foot fence. A separate fence between the City park and the perimeter of the MCPC is also in place. The gates of the fences recently have been locked, thereby requiring entry through the main entrance. In addition, in the main building the State will be installing an electronic security system to keep out intruders at a cost of some $80,000. It will operate when the building is not in use.

In response to staff requests, MCPC also began a system of private van transportation between Manhattan and the facility in

June of 1981. The van operates when hospital staff is available to drive it.

At Keener, there are eight security guards on the staff for each given shift. One security guard is posted by the entrance of the building, one on each floor of the building, one by the footbridge, and one by the area of the building closest to the MCPC. The guards are instructed that Keener men are not permitted to walk on the MPC campus.

In addition, the area behind Keener is fenced in, as is the new construction area. The City agreed to install a fence around the complex, to be built in January, 1982, to lock the footbridge, and to position security guards at the various places mentioned above. Although opposed to the concept, the City also agreed to institute a separate transportation system, and the men are no longer routinely given tokens.

As a result of negotiations between the State and the City taking place during the trial of this action, there will be two eight foot security fences, curved at the top with a one-inch meshing, an opaque barrier, and locked exit gates. All men will enter the complex by City van and will be escorted in. The outdoor recreation area for the men will continue to be fenced in. In addition, the City is now having its police evaluate the need for additional security at Keener.

Expert testimony established that the hospitals seek to provide a therapeutic milieu which creates an asylum from the stress and violence of the outside world. Although violence occurs within the hospitals, it is confined to an area in which patients are protected by staff who have authority to act and who have access to protection. The staff are trained to minimize episodes occurring in the hospital setting and to neutralize the negative impact on the patients. Such violence is viewed as part of an illness for which a patient is being treated.

In contrast, staff are not trained to deal with violence caused by outsiders which intrudes on the hospital's community and are themselves threatened by such episodes. Such encounters induce patients' fear of the repetition of violence, increase their defenses against harmful memories of past violent incidents, and awaken the patients' own latent violent impulses. These consequences harm the patients' therapeutic progress and are detrimental to the hospitals' goal of establishing a therapeutic atmosphere.

### Incidents Involving the Populations

Central to the position of the plaintiffs is the allegation that the operation of the Keener Building and its occupation by homeless men has endangered the safety and treatment of the patients at the MCPC. The demonstration of their injury, or the threat of such injury, turns on the details of specific incidents which have involved Keener residents and patients or staff of the MCPC. The threshold for the admission by the plaintiffs of evidence concerning these incidents was concededly set low, and every presumption in support of admissibility and credibility has been adopted, in part, to minimize the significance of a dispute between the parties as to whether the execution of the incident reports, the principal source of information concerning particular incidents, has been fulsome, as claimed by the State and City defendants, or niggardly, as claimed by the plaintiffs. Each known incident is set forth.[6]

The more serious incidents known to MPC security were referred to the Safety Committee. In 1979 some 313 incidents were reported, fourteen percent of which involved outsiders and two involved trespasses by Keener residents. Of the 327 such incidents in 1980, six involved Keener residents. In 1981 to the date of the hearing there had been 281 incidents, of which 36 involved Keener residents. None were considered serious and most involved trespass onto the grounds of the MPC.

---

6. It is established that City and State defendants knew of all the incidents reported in the complaint. Seide contends that they have not taken any steps to prevent such incidents from recurring. City and State defendants deny this and their actions have been described in the preceding portion of the text.

*The Sherranda Rush Incident*

On April 29, 1981, two staff members were returning to the MCPC from the Rehabilitation Center with a group of children when a man grabbed one of the staff members, Sherranda Rush, and pushed her. Ms. Rush began screaming, the children got excited and began to run. The man turned Ms. Rush loose and walked away. She was not physically injured. With the assistance of her supervisor, Ms. Rush identified the man, and charges were brought arising out of the incident which were later dismissed. The six children accompanying Ms. Rush saw the incident, two got very excited, one became upset and started shaking, but in discussion with his therapist later stated that he saw Ms. Rush wasn't hurt, and "that was the end of that." According to the MCPC review of this incident, no child suffered emotional injury and no changes in treatment programs were required.

*The Incident of Exposure*

On May 7, 1981, a staff member of MCPC was advised that a man coming from the direction of the Keener facility exposed himself to a ten-year-old male patient, and a student therapist through the fence that surrounds the facility. According to the MCPC's review the child did not suffer any emotional injury.

*The Incident of a Patient Who Was Taken to Babies Hospital*

On May 4, 1981, a patient was reported to have been seen with a man outside the main building and to have stated that the man was her cousin, who worked in the Keener building, and they discussed how a lunch date might be arranged. The report states that approximately one hour later the patient was caught running on the grounds and collapsed while being returned to the school area and then became hysterical. According to the report the patient stated that she smoked angel dust and a similar statement was made to one of plaintiffs' experts by a therapy aide. The patient was taken to Babies Hospital and returned apparently in satisfactory condition. The Director of Nursing Services saw the patient that day after the incident and stated that the patient had been awake, responded coherently, and that her condition was not serious.

The treating physician, Yogesh Pandya, M.D., based on what he had been told and his diagnosis, determined that it was necessary to "rule out" marijuana and angel dust. The doctor did not assert any expertise in drug related illnesses as such. Babies Hospital provided a diagnosis of marijuana intoxication prior to the receipt of the lab tests for serum toxicology which were later found to be negative. The patient was returned to the MCPC the same day as the incident.

*The Break-In at Cottage One*

On September 6, 1981, according to an incident report, an unknown person threw a brick through the window of the staff lounge at Cottage 1 and attempted to steal a bicycle. The man was seen going out of the window, apparently injured and left a trail of blood. Security was immediately notified, and the intruder, identified as a Keener resident, was arrested. There was no testimony that any child observed the incident, and the review of the incident indicated no harm was done to any child. The staff lounge is off limits to patients.

*Miscellaneous Incidents*

On February 22, 1981, a social worker was reported to have been on a bus with her eight-year-old patient who observed two drugged men holding hands to the child's shock and amazement. On April 7, 1981, there is mention that patients were reported to have been harassed at the bus stop. On an unspecified date, a sixty-year-old man was reported to have asked to see "little girls in pigtails." On other occasions a man tried to gain entrance to Cottage 1 through the locked front door and to the gym in the main building without success.

In addition three members of MCPC staff reported interaction with presumed Keener residents, principally on the public transportation but also on occasion within the MCPC administration building at the vending machines or at large within the building. Additionally, one of the plaintiffs tes-

tified that her son had seen "drunken men" on the grounds of the MPC and that his terror at such encounters had been such that he had lost his unescorted grounds privileges.

### Conclusions of Law

Based on the facts as found above, conclusions of law must be set forth with respect to the standing of the plaintiffs, the application of the doctrine of abstention, the adequacy of the complaint to state a constitutional cause of action, and the adequacy of the proof to establish such a cause.

The first three of these issues were addressed in a Rule 12(b) motion on which decision was reserved. For the reasons set forth below, I conclude the plaintiffs have standing, abstention is not appropriate, and the complaint states a cognizable constitutional cause. However, I also conclude that the evidence submitted failed to establish constitutional violations by a preponderance of the credible evidence and that therefore this complaint will be dismissed and judgment entered on behalf of the State and City defendants.

### 1. Standing

Defendants challenge the standing of Seide and the members of the Board of Visitors to initiate this action under Rule 17(c) Fed.R.Civ.P. as next friend to the children at MCPC. Additionally, defendants contend that Barbara J. Robinson, the representative of her daughter, who is a patient at MCPC, and Rose Lange, the mother of an adult patient at MCPC, allege only general wrongs suffered by patients at the hospital and lack the requisite specific injury necessary to confer standing.

Rule 17(c) provides that: "If an infant or incompetent person does not have a duly appointed representative he may sue by his next friend or by a guardian ad litem." Although the rule does not delineate who may be next friend, the "term is broad enough to include anyone who has an interest in the welfare of an infant who may

have a grievance or a cause of action." *Child v. Beame*, 412 F.Supp. 593, 599 (S.D. N.Y.1976). Defendants have cited two cases to support the conclusion that the members of the Board of Visitors lack the capacity to sue, but neither are particularly pertinent. *Munzer v. State*, 41 N.Y.S.2d 98 (Ct.Claims.1943) is silent on this subject and *Hartman v. Carey*, No. 22516/79 (N.Y.Sup. Ct.1981) resulted in default when plaintiff failed to respond to a motion to dismiss.

■ The members of the Board of Visitors are by definition persons who are interested in the welfare of the patients at MCPC. N.Y.Mental Hyg. § 7.33(a)(McKinney). The defendants correctly point out, however, that the statute does not empower members of the Board of Visitors to serve as legal advocates for the children. However, this status is not conferred as a matter of State law but rather is a matter of the court's discretion pursuant to Rule 17(c). "The right of access to courts by those who feel they are aggrieved should not be curtailed; and this is particularly so in the instance of children who, rightly or wrongly, attribute such grievances to their very custodians. Those who propose to speak for the plaintiffs have manifested an interest in their welfare and should ... be allowed to proceed." *Child v. Beame*, 412 F.Supp. at 599. Since state law does not create a statutory bar, N.Y.Mental Hyg. § 7.33(a); N.Y.Pub.Off. §§ 73, 74, the members of the Board of Visitors, having manifested a genuine concern for the wellbeing of the patients, may serve as the next friend to the children at MCPC.[7] *See also Wyatt v. Stickney*, 325 F.Supp. 781, 782 (M.D.Ala.1971).

In addition to challenging whether the Board of Visitors are "proper proponents of the particular legal rights on which they base their suit," *Singleton v. Wulff*, 428 U.S. 106, 112, 96 S.Ct. 2868, 2873, 49 L.Ed.2d 826 (1976), defendants question whether members of the Board of Visitors, Robinson

---

**7.** Plaintiffs submitted evidence at trial that some parents of the patients at MCPC cannot adequately protect the interests of the children

because of parental drug or alcoholic problems, emotional disabilities, or abuse or neglect of their own children.

and Lange, "allege 'injury in fact,' that is, a sufficiently concrete interest in the outcome of their suit to make it a case or controversy subject to a federal court's Art. III jurisdiction." *Id.* Defendants object to the general and conclusory terms of the complaint.

The general allegations contained in the complaint describe an attempted break-in at the children's cottage, sexual exposure to children, trespass on hospital grounds and in buildings, and an assault of a staff member.[8] Although general in nature, these allegations suggest an environment which may constitute a threat to the interest of the individually named patients and others similarly situated to be protected from attack and to receive mental health care treatment.

■ In considering a motion to dismiss, the court must accept the allegations as true and more than an isolated incident of negligence is alleged. The alleged pattern of violations against the hospital community is sufficiently concrete to establish a significant threat to the patients' mental and physical safety and well-being. This threat results from a pattern of episodes that invites fear and the potential for physical and psychological harm and constitutes a "distinct and palpable injury" to a patient at the State hospitals. Both Robinson and Lange have claimed injury to their mental well being, and that of other patients arising from incidents which negatively impact on the therapeutic milieu and which cause harmful emotional reactions, heightened fear and insecurity. *See Carey v. Piphus,* 435 U.S. 247, 264 & n.20, 98 S.Ct. 1042, 1052 & n.20, 55 L.Ed.2d 252 (1978); *White v. Rochford,* 592 F.2d 381 (7th Cir. 1979); *James v. Board of School Comm'ns.,* 484 F.Supp. 705, 714 (S.D.Ala.1979).

■ The Supreme Court has recently reiterated that standing depends on whether any plaintiff is "suffering immediate or *threatened* injury as a result of the challenged action." *Valley Forge Christian College v. Americans United For Separation of Church and State, Inc.,* —— U.S. ——, —— n.14, 102 S.Ct. 752, 761 n.14, 70 L.Ed.2d 700 (1982) (quoting *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343)(1975)(emphasis added). Activities which threaten human life are cognizable and may be enjoined even before the threat matures to result in physical injury or death. *Resident Advisory Bd. v. Rizzo,* 503 F.Supp. 383, 389 (E.D.Pa.1980); *see Harris Stanley Coal & Land Co. v. Chesapeake & O. Ry. Co.,* 154 F.2d 450, 453 (6th Cir.), *cert. denied,* 329 U.S. 761, 67 S.Ct. 111, 91 L.Ed. 656 (1946). To deny recourse to the courts simply because physical injury has not yet occurred would manifest a callous disregard for the safety of psychiatric patients who are unable to protect themselves. This is not to say that any one threat constitutes a legally cognizable claim for injunctive relief, but when, as in the instant case, numerous incidents over a six-month period are alleged to constitute a significant risk to patients at a State hospital, this court will recognize the alleged pattern of violations as sufficient to establish a direct impact on the individually named plaintiffs and on the purported class. *See Child v. Beame,* 412 F.Supp. at 599.

■ A patient at the State hospitals or her next of friend has the "requisite personal stake in the outcome of the controversy" which seeks to vindicate her right to protection from harm, *New York State Ass'n for Retarded Children, Inc. v. Rockefeller,* 357 F.Supp. 752, 764–65 (E.D.N.Y.1973), and her right to mental health care treatment. *Romeo v. Youngberg,* 644 F.2d 147 (3d Cir. 1980)(en banc), *cert. granted,* 451 U.S. 982, 101 S.Ct. 2313, 68 L.Ed.2d 838 (1981). Thus, the members of the Board of Visitors, Robinson, and Lange have standing to maintain this lawsuit.

## 2. Abstention

Defendants urge this court to decline to exercise federal jurisdiction under the doctrine of abstention, claiming that important

---

**8.** The break-in occurred in Cottage # 1, where Barbara Robinson resides. The complaint contains allegations that her treatment has been curtailed because of such incidents.

State interests involving mental health care treatment for patients in State hospitals and shelter care for homeless men are in issue and should be decided in State court, that Seide had the opportunity to intervene in *Callahan,* which issued the consent judgment providing for the use of the Keener Building as a shelter for homeless men, and that State statutory claims warrant State court adjudication.

"Abstention from the exercise of federal jurisdiction is the exception, not the rule." *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976). Similarly, the Second Circuit has advised that abstention is discretionary and that federal courts should abstain only in exceptional circumstances. *Marshall v. Chase Manhattan Bank,* 558 F.2d 680 (2d Cir. 1977); *Shelton v. Smith,* 547 F.2d 768 (2d Cir. 1976); *Cordova v. Reed,* 521 F.2d 621 (2d Cir. 1975); *Brown v. First Nat. City Bank,* 503 F.2d 114 (2d Cir. 1974); *Freda v. Lavine,* 494 F.2d 107 (2d Cir. 1974).

■ The factors that defendants put forward do not meet the standard of exceptional circumstances. Seide is not, and has not been, a party to *Callahan. Callahan* delineated the rights of the homeless to receive shelter care. The rights of the patients at the State hospitals on Ward's Island are not, and were never, before that court. The complaint before this court alleges violations of the Eighth and Fourteenth Amendments and seeks relief pursuant to 42 U.S.C. § 1983. Possible constitutional violations, bearing on State issues and capable of resolution in State court, need not be brought there. "Indeed, § 1983 challenges the constitutionality of institutional treatment of inmates, including juveniles and mental patients, are now routinely heard by federal courts." *McRedmond v. Wilson,* 533 F.2d 757 (2d Cir. 1976). Although the complaint also alleges violations of State statutes, these statutes are not ambiguous.[9] Abstention is only appropriate when State law is uncertain and when a State court is the only authoritative

source of construction. *Lucas v. Wasser,* 425 F.Supp. 955, 959–60 (S.D.N.Y.1976). As in *Lucas,* although an interpretation by a State court of the State statutes may be lacking, the "statutory scheme is clear and is capable of interpretation by a federal court." *Id.* at 960. The issue in the instant case is similarly "one essentially of fact rather than statutory interpretation, that is whether [patients at state mental hospitals] are being confined in accordance with the standards of the due process and equal protection clauses; and of the eighth amendment." *Id.*

Seide has alleged constitutional violations, thereby invoking this court's jurisdiction. The defendants have failed to establish the exceptional circumstances sufficient to warrant abstention.

3. *Failure to State a Federal Claim*

Defendants question the existence of a cognizable federal claim arising out of constitutional rights to treatment and further contend that the reported occurrences are isolated incidents, which do not rise to the level of constitutional deprivations.

■ The plaintiffs allege violations of the Eighth and Fourteenth Amendments. The defendants contend that the Eighth Amendment is applicable only to those charged with crimes, since every decision of the Supreme Court that has found a violation of the Eighth Amendment's prohibition of cruel and unusual punishment related to criminal punishment. *Ingraham v. Wright,* 430 U.S. 651, 666, 97 S.Ct. 1401, 1409, 51 L.Ed.2d 711 (1977). However, the Court acknowledged applicability of the Eighth Amendment in other settings. *Id.* at 669 n.37, 97 S.Ct. at 1411 n.37. Indeed, courts have analogized the rights of patients at State hospitals to the rights of prisoners, *New York State Ass'n for Retarded Children, Inc. v. Rockefeller,* 357 F.Supp. 752, 764 (E.D.N.Y.1973); *Lollis v. New York State Dept. of Soc. Servs.,* 328 F.Supp. 1115 (S.D.N.Y.1971), and have concluded that residents of state mental hospitals "have a

**9.** *See* footnote 1.

right, whether grounded on due process or the Eighth Amendment, or both, to a humane and safe living environment while confined under State Authority." *Welsch v. Likins*, 373 F.Supp. 487 (D.Minn.1974). Further a patient at a state hospital has the constitutional right, "under the Fourteenth Amendment, to be secure in his life and person while confined under state authority." *Spence v. Staras*, 507 F.2d 554, 557 (7th Cir. 1974); *see New York State Ass'n for Retarded Children, Inc. v. Rockefeller*, 357 F.Supp. at 764.

▇▇▇ Thus, patients at the State hospitals on Ward's Island have a constitutional right to safety while in State custody. Although the "right to protection is not activated by an isolated mishap," *Romeo v. Youngberg*, 644 F.2d at 163, the complaint alleges "more than an 'isolated incident' or mere negligent supervision." *Spence v. Staras*, 507 F.2d at 557. Alleged episodes of trespass, attempted break-in, assault and sexual exposure, indicate that the patients' constitutional right to protection may be jeopardized. In alleging these episodes, which affect the right to safety of children at MCPC, the complaint states a cause of action cognizable in federal court.

▇▇▇ The complaint also alleges trespass in the buildings and on the grounds of the adults' hospital, breaking and entering, theft of New York State property, and theft of property from the chapel on the State campus. Complaint, ¶ 32(d). Seide contends that these incidents violate the adult patients constitutional right to protection. Although not as grave as the allegations relating to the children, these incidents may be viewed as part of a pattern of intrusions against the hospital community. As such, they may constitute a challenge to the adult patients' right to safety. For purposes of this motion to dismiss, they are sufficient to state a federal claim.

Additionally, Seide asserts violations of the patients' right to receive effective treatment while in State custody. The constitutional right to mental health care treatment is presently evolving as a consequence of case law. Although the Supreme Court has forcefully addressed the issues pertinent to the determination of whether a person may be involuntarily committed to a psychiatric hospital and has held that there is no constitutional basis for a state to confine a mentally ill person involuntarily if he is not a danger to himself or others and if the purpose of confinement is custodial, *id.* at 575, *O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), it has not determined the existence of a right to mental health care treatment.

▇▇ Custodial care has been distinguished from treatment. *Rouse v. Cameron*, 373 F.2d 451, 455 (D.C.Cir.1967); *Wyatt v. Stickney*, 325 F.Supp. 781, 784 (M.D.Ala. 1971). Custodial care includes food, shelter, safety, and medical care. It is directed at maintaining the patient's status quo. *Wyatt v. Aderholt*, 503 F.2d 1305, 1306 N.1 (5th Cir. 1974). Patients who are confined in a State hospital and who are subject to State authority have a constitutional right to such care. *Id.* at 1312–1313; *New York State Ass'n for Retarded Children, Inc. v. Rockefeller*, 357 F.Supp. at 758–62. I have concluded above that the complaint has stated a cause of action in that regard, however, such a conclusion does not necessarily include the right to treatment.

▇▇ Lower courts have reasoned that a person who is involuntarily committed to a State hospital because of mental illness also has an additional constitutional right to treatment which would provide the patient some hope or chance for release. *Covington v. Harris*, 419 F.2d 617 (D.C.Cir.1969); *Rouse v. Cameron*, 373 F.2d 451 (D.C.Cir. 1967); *Wyatt v. Stickney*, 325 F.Supp. 781 (M.D.Ala.1971). Inherent in the concept of treatment is a program of staff working with individual patients on a regular basis, i.e., psychiatric, psychological, or social work counseling, staff physician evaluation, and significant treatment sessions. *Wyatt v. Aderholt*, 503 F.2d at 1306 N.1. The right to treatment is based on the liberty interest protected by the Fourteenth Amendment's due process clause. In *Scott v. Plante*, 641 F.2d 117 (3d Cir.), *cert.*

*granted,* —— U.S. ——, 102 S.Ct. 3474, 71 L.Ed.2d ——, (1981), the court determined that *Scott* had a constitutional right to treatment. "Had Scott been at large he might have been in a position to seek the treatment which would alleviate his mental illness. ... [t]he state may not both deprive him of the liberty to seek treatment and of the treatment as well." *Id.* at 133; *see Romeo v. Youngberg,* 644 F.2d 147 (3d Cir. 1980) (en banc), *cert. granted,* 451 U.S. 982, 101 S.Ct. 2313, 68 L.Ed.2d 838 (1981); *Donaldson v. O'Connor,* 493 F.2d 507, 521 (5th Cir. 1974), *vacated and remanded,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975).

■ Once the State assumes responsibility for a patient by admitting him to a State mental hospital that is operated under State authority, the State is acting under color of law. *See O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975); *Fitzgerald v. Porter Memorial Hospital,* 523 F.2d 716 (7th Cir. 1975), *cert. denied,* 425 U.S. 916, 96 S.Ct. 1518, 47 L.Ed.2d 768 (1976); *Spence v. Staras,* 507 F.2d 554 (7th Cir. 1974); *Patricia B. v. Jones,* 454 F.Supp. 18 (W.D.Pa.1978). The State, however, has denied the existence of a right to treatment, relying in part on the fact that certain of the patients in the MCPC and MPC have been voluntarily admitted.

■ Regardless of whether a patient was voluntarily admitted or committed, the State may not subject any citizen "to the deprivation of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. The rights to life and personal liberty are the most fundamental rights guaranteed by the Constitution. A classification which would guarantee the right to life of persons committed to State institutions but which would deny this right to persons voluntarily admitted could not stand strict scrutiny required by the equal protection clause. *Goodman v. Parwatikar,* 570 F.2d 801, 804 (8th Cir. 1978); *Harper v. Cserr,* 544 F.2d 1121 (1st Cir. 1976).

■ Moreover, the categorization of patients as voluntary admissions is of dubious value here. As the Honorable John J. Gibbons observed, voluntary "residents do not understand the available alternatives to institutionalization, or are physically unable to express an interest in leaving, or have no adequate alternative living arrangement. Thus the motion of voluntariness in admission and retention was found to be illusory." *Halderman v. Pennhurst State School & Hospital,* 612 F.2d 84, 94 (3d Cir. 1979), *rev'd on other grounds and remanded,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). I conclude that the classification of committed and admitted patients is a distinction without a difference in the determination of patients' rights to life and to personal liberty, and concomitantly to treatment.

■ In *New York Ass'n For Retarded Children,* 357 F.Supp. at 762, the Honorable Drew G. Judd stated that a " 'voluntary admission' on the petition of parents may quite properly be treated in the same category as an 'involuntary admission.' " Despite being designated as voluntary patients, the children at the MCPC are not free to leave. Those who attempt to flee are returned to the hospital. The voluntary committed patients at MCPC, "if not confined *de jure* are at least confined *de facto.*" *Harper v. Cserr,* 544 F.2d at 1123. Although acting pursuant to the direction of parents or guardians in admitting patients to MCPC, the State is the vehicle or proximate cause by which restrictions are placed on a patient's liberty. Consequently, the argument that the Fourteenth Amendment guarantee of liberty extends to the right to mental health care treatment applies to voluntary patients at the MCPC.

■ Additionally, a State hospital represents itself as a hospital. Hospitals are presumed to provide treatment to all its patients. Throughout *Parham v. J. R.,* 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979), the Supreme Court assumes the existence of such treatment. *Id.* at 601, 603, 604, 605, 609, 610, 616, 99 S.Ct. at 2503, 2504, 2505, 2506, 2507, 2508, 2511. These presumptions buttress my conclusions with

respect to the existence of a right to treatment.

■ Finally, the complaint succeeds in alleging an abridgement of the plaintiffs' rights, just concluded. It alleges that frightening encounters between the homeless men and the patients are destructive of an effective therapeutic atmosphere. Specifically, it alleges that the use of outdoor recreational facilities has been curtailed, that adult patients' grounds privileges have been restricted, that visitors are discouraged from visiting patients because of the presence of homeless men on the public bus to Ward's Island, that assaults by homeless men on staff deprive patients of effective treatment because of staff preoccupation with their own safety, that staff may be forced to resign, that witnessing an assault impairs a patients' therapy, all thereby negatively affecting patients' treatment. Thus the complaint, albeit barely, alleges sufficient facts which, taken together, constitute a charge of deprivation of safety and treatment of constitutional magnitude sufficient to withstand defendants' motion to dismiss.

### 4. Injunctive Relief on the Merits

In the instant case, this court need not attempt to define or prescribe the treatment required to satisfy constitutional safeguards. The allegations that the presence of homeless men on Ward's Island deprive patients of their right to safety and mental health care treatment have not been proven by a preponderance of the evidence.

■ The testimony at trial indicates that patients continue to receive individual or group therapy with psychiatrists, psychologists or social workers, medication, supervision, education and recreation, as well as custodial care without regard to the presence of the Keener residents. Ms. Robinson's fear of homeless men does not curtail the hospital's provision of treatment services. The suspension of Mr. Lange's unescorted ground privileges because of his fear of homeless men and because of his therapist's concern for a possible incident is a treatment decision, consistent with similar past suspensions for other reasons. Such

suspensions do not amount to deprivations of a right to treatment. Both Ms. Robinson and Mr. Lange and the represented plaintiffs continue to receive mental health care treatment, which plaintiffs' expert witnesses admitted ranged from satisfactory to excellent. Thus, the plaintiffs have failed to prove violations of rights to mental health care treatment.

■ Deprivation of the right to custodial care has not been alleged except with respect to the right to safety. The allegation that the right to safety has been violated has been raised independent of its relation to the right to treatment. The plaintiffs have failed to establish any substantial evidence that the right to safety of patients at MPC has been violated. Thus the complaint is dismissed as to those patients.

■ The plaintiffs have, however, submitted evidence of incidents of harassing and intimidating behavior that threaten the right to safety of patients at the MCPC. However, none of these incidents have arisen to the level of deliberate indifference or wanton neglect which could give rise to a claim for damage under § 1983 cases. Further the incidents were made known to the defendants and as a consequence the State and City have taken measures described above to prevent the occurrence of such incidents and to ensure the protection of patients' constitutional right to safety. The State and City defendants have acted in a reasonable manner to prevent future harm and thus obviated the need for injunctive relief.

■ Plaintiffs contend that the protective measures undertaken by the defendants are voluntary and may be the first to be cutback due to fiscal constraints. The defendants are on notice, however, that provision of adequate security at the MCPC is constitutionally mandated. Any cutback in security which gives rise to conduct which threatens deprivation of patients' constitutional right to safety is actionable. *Rouse v. Cameron*, 373 F.2d at 457; *New York Ass'n For Retarded Children v. Rockefeller*, 357 F.Supp. at 762; *Wyatt v. Stick-*

*ney*, 325 F.Supp. at 784–85. Similarly, plaintiffs are concerned that the expansion of the Keener Building will aggravate conditions on Ward's Island and render existing security measures inadequate. In this regard also, adequate security, both at MCPC and at Keener, is constitutionally mandated. Once the State chooses to provide benefits to its citizens, it is subject to constitutional limitations. *Maher v. Roe*, 432 U.S. 464, 469–70, 97 S.Ct. 2376, 2380–81, 53 L.Ed.2d 484 (1977); *Williams v. Barry*, 490 F.Supp. 941, 945–46 (D.D.C.1980). Since both the MCPC and the Keener Building are operated under color of State law, the State and City may not impinge upon the rights of the residents of each facility to be secure in their life and person. Any claim that plaintiffs might have against the State and City for anticipated cutbacks is premature, particularly in the absence of proof of significant past danger. Therefore, in light of the completed and anticipated remedial measures by the State and City, an injunction is not warranted. Consequently, judgment will be entered dismissing the complaint, the plaintiffs having failed to adduce proof sufficient to establish its allegations.

It is by such findings and conclusions that courts are required by Congress and by litigants to declare the rights granted to our citizens by our Constitution, even if it can be said that such declarations "make policy." Whether functioning as "robed prophets" as described critically by the Attorney General [10] or simply in performance of their oath of office, judges cannot, and must not avoid the performance of their duty to understand, apply and develop the law. To breathe contemporary life into our most significant governing document within the framework of the genius and the demands of our common law is surely one of the most vital functions of our society.

10. Address by Attorney General William French Smith to the American Bar Association (January 25, 1982) in which the performance of judges as "robed prophets" and policy makers was the subject of criticism. However, the prophets in the Biblical tradition were the men and women who challenged the Kings and people to obey the Torah—the governing document of their heritage—and condemned viola-

Settle judgment on notice within ten (10) days. No costs or disbursements will be granted.

IT IS SO ORDERED.

tions of the law and safeguarded the rights of individuals, especially the widows, orphans, poor and sick. *See* 2 Samuel 12, Amos 5:10–15, Matthew 5. In upholding and defining constitutional rights judges may as a matter of history properly be termed "robed prophets" even though the term can be considered critical in contemporary use.